[14 NE3d 970, 991 NYS2d 386]

In the Matter of ALLEN B., Respondent, v CHRISTINE A. SPROAT, Justice of the Supreme Court, Dutchess County, et al., Appellants, et al., Respondent.

In the Matter of ROBERT T., Respondent, v CHRISTINE A. SPROAT, Justice of the Supreme Court, Dutchess County, et al., Appellants, et al., Respondent.

Argued March 24, 2014; decided May 13, 2014

**POINTS OF COUNSEL**

*Eric T. Schneiderman, Attorney General,* New York City (*Andrew W. Amend, Barbara D. Underwood* and *Steven C. Wu* of counsel), for appellants in the first and second above-entitled proceedings. Effective-evaluation provisions fall well within CPL 330.20's broad grant of authority to courts charged with supervising insanity acquittees. (*Matter of Nicholson v State Commn. on Jud. Conduct,* 50 NY2d 597; *Matter of Schumer v Holtzman,* 60 NY2d 46; *Matter of Francis S.,* 206 AD2d 4, 87 NY2d 554; *Matter of George L.,* 85 NY2d 295; *Matter of Jill ZZ.,* 83 NY2d 133; *Matter of Oswald N.,* 87 NY2d 98; *People v Stone,* 73 NY2d 296; *Matter of K.L.,* 1 NY3d 362; *C.R. v Adams,* 649 F2d 625.)

*Lesley M. DeLia, Mental Hygiene Legal Service,* Mineola (*Lisa Volpe, Scott Wells* and *Dennis B. Feld* of counsel), for respondents in the first and second above-entitled proceedings. Under the existing statutory scheme of CPL 330.20, and in accord with constitutional due process, an order of conditions may not

properly contain an ex parte enforcement provision authorizing the temporary confinement of a conditionally released acquittee. (*Matter of Oswald N.*, 87 NY2d 98; *Matter of Albert F.*, 5 AD3d 5; *Matter of Oliver C. v Weissman*, 203 AD2d 458; *People v Stone*, 73 NY2d 296; *Arons v Jutkowitz*, 9 NY3d 393; *Morales v County of Nassau*, 94 NY2d 218; *Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367; *Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98; *Matter of George L.*, 85 NY2d 295; *Matter of Francis S.*, 206 AD2d 4.)

*Kathleen M. Rice, District Attorney*, Mineola (*Jacqueline Rosenblum, Tammy J. Smiley* and *Rebecca Abensur* of counsel), for District Attorneys Association of the State of New York, amicus curiae in the first and second above-entitled proceedings. The Appellate Division, Second Department's order is inconsistent with the purpose of the statute to ensure public safety and therefore should be reversed. (*Matter of Francis S.*, 87 NY2d 554; *Matter of Oswald N.*, 87 NY2d 98; *Matter of Norman D.*, 3 NY3d 150.)

**OPINION OF THE COURT**

READ, J.

The issue common to these appeals is whether a supervising court may include in an order of conditions a provision allowing the New York State Office of Mental Health (OMH) to seek judicial approval of a mandatory psychiatric evaluation in a secure facility when a defendant found not responsible by reason of mental disease or defect fails to comply with the conditions of his release and refuses to undergo voluntary examination. For the reasons that follow, we hold that Criminal Procedure Law § 330.20 does not prohibit inclusion of such a requirement (which OMH calls an "effective-evaluation provision") in an order of conditions, and therefore reverse. To put our holding in context, we begin with an overview of the postverdict procedures established by section 330.20.

## I.

### The Examination Order

Following an insanity verdict or plea, the trial judge must immediately order a psychiatric examination of the defendant, to be followed by an initial hearing to determine the defendant's current mental state (*see* CPL 330.20 [2]-[6]). The examination usually takes place in a secure facility for a period not exceeding

30 days, subject to extension upon application by the Commissioner of OMH (the Commissioner) to the court (*see id.* § 330.20 [4]); at least two qualified psychiatric examiners must examine the defendant and prepare reports for submission, in the first instance, to the Commissioner, and then to the judge (*see id.* § 330.20 [2], [5], [15]).

### The Initial Hearing, Commitment Orders and Orders of Condition

Within 10 days after receipt of the examination reports, the trial judge must conduct an initial hearing to classify the defendant as track one, two or three (*see id.* § 330.20 [6], [7]; *see also People v Stone*, 73 NY2d 296, 300 [1989]). Track-one defendants are those found by the trial judge to suffer from a dangerous mental disorder; i.e., a mental illness that makes them "a physical danger to [themselves] or others" (*see id.* § 330.20 [1] [c]; [6]). Track-two defendants are mentally ill,[1] but not dangerous (*see id.* § 330.20 [1] [d]; [6], [7]), while track-three defendants are neither dangerous nor mentally ill (*see id.* § 330.20 [7]). "Track status, as determined by the initial commitment order, governs the acquittee's level of supervision in future proceedings and may be overturned only on appeal from that order, not by means of a rehearing and review" (*Matter of Norman D.*, 3 NY3d 150, 152 [2004]).

The trial judge must issue a commitment order consigning track-one defendants to the custody of the Commissioner for confinement in a secure facility for care and treatment for six months (*see id.* § 330.20 [1] [f]; [6]). Track-two defendants are ordered into the Commissioner's custody for detention in a non-secure (civil) facility, subject to an order of conditions (*see id.* § 330.20 [1] [o]; [7]). The order committing a track-two defendant is deemed made pursuant to the Mental Hygiene Law rather than section 330.20; concomitantly, subsequent proceedings

---

1. The statute defines a "mentally ill" defendant to include one who "currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of [OMH], is essential to such defendant's welfare and [whose] judgment is so impaired that he is unable to understand the need for such care and treatment" (CPL 330.20 [1] [d]). Where a defendant is mentally retarded, "mentally ill" also means, for purposes of section 330.20, "that the defendant is in need of care and treatment as a resident in the in-patient services of a developmental center or other residential facility for the mentally retarded and developmentally disabled under the jurisdiction of the state office of mental retardation and developmental disabilities" (*id.*).

regarding retention, conditional release or discharge of a track-two defendant are governed by articles 9 (mentally ill) or 15 (mentally retarded) of the Mental Hygiene Law (*see id.* § 330.20 [7]). Track-three defendants are discharged either uncondition-ally or, in the judge's discretion, with an order of conditions (*see id.*; *see also id.* § 330.20 [1] [n] [a discharge order is defined as "an order terminating an order of conditions or unconditionally discharging a defendant from supervision under the provisions of (section 330.20)]"*).

An order of conditions is "an order directing a defendant to comply with [the] prescribed treatment plan, or *any other condition which the court determines to be reasonably necessary or appropriate*, and, in addition, where a defendant is in custody of the commissioner, not to leave the facility without authorization" (*see id.* § 330.20 [1] [o] [emphasis added]; *see also id.* § 330.20 [12], discussed infra). Such orders are valid for five years and may be extended for good cause shown (*see id.* § 330.20 [1] [o]; *see also Matter of Oswald N.*, 87 NY2d 98, 105 [1995]).

## First and Subsequent Retention Hearings: Retention Orders, Transfer Orders and Release Orders

At least 30 days before a track-one defendant's initial six-month commitment period lapses, the Commissioner must apply to the trial judge, or a superior court in the county where the defendant is securely housed, for a first retention order or a release order (*see id.* § 330.20 [8]). The Commissioner must give written notice of this application to the district attorney, the defendant, his counsel and the Mental Hygiene Legal Service. Upon receipt of the application, the judge on his own motion may, or upon timely demand by one of those individuals or entities receiving notice must, conduct a hearing.

If the judge finds that the track-one defendant still suffers from a dangerous mental disorder, he must issue a first retention order, authorizing secure confinement for another year, and thereafter (before expiration of the first, second and any subsequent retention orders, and assuming the defendant's dangerous mental disorder persists) for succeeding periods of up to two years (*see id.* § 330.20 [1] [g]-[i]; [8], [9]). Alternatively, if the judge finds during a first or subsequent retention proceeding that a track-one defendant is mentally ill but no longer suffers from a dangerous mental disorder, he must issue a retention

order along with a transfer order and an order of conditions (*see id.* § 330.20 [8], [9], [11]). In the event that the judge finds that the defendant no longer suffers from a dangerous mental disorder and is not mentally ill, he must issue a release order and an order of conditions (*see id.* § 330.20 [8], [9], [12]).

A transfer order directs the Commissioner to move the defendant from secure to nonsecure confinement (*see id.* § 330.20 [1] [*l*]). A release order directs the Commissioner to terminate the defendant's in-patient status without ending his responsibility for the defendant (*see id.* § 330.20 [1] [m]). When a defendant is in the Commissioner's custody before expiration of the period prescribed in a first, second or subsequent retention order, the same procedures govern application for issuance of any subsequent retention order (*see id.* § 330.20 [9]).

## Transfer Orders Generally

At any time while the track-one defendant is in the Commissioner's custody pursuant to a retention or recommitment order, the Commissioner may apply to the court that issued the order then in effect, or to a superior court in the county where the defendant is securely housed, for a transfer order if, in his view, the defendant no longer suffers from a dangerous mental disorder, or, "consistent with the public safety and welfare of the community and the defendant, the [defendant's] clinical condition . . . warrants" the lesser level of confinement (*see id.* § 330.20 [11]). The Commissioner must give 10 days' written notice of this application to the district attorney, the defendant, his counsel and the Mental Hygiene Legal Service.

Upon receipt of the application, the judge on his own motion may, or upon demand by the district attorney must, conduct a hearing on the application. He must grant the application and issue the transfer order, along with an order of conditions, if he finds that the defendant does not suffer from a dangerous mental disorder, or that the defendant's transfer from secure to nonsecure detention is consistent with public safety and welfare of the community and the defendant, and is warranted by the defendant's clinical condition.

## Release Orders Generally

At any time while the track-one defendant is in his custody pursuant to a retention or recommitment order, the Commissioner may apply to the court that issued the order then in effect, or to a superior court in the county where the defendant is

housed, for a release order if, in the Commissioner's view, the defendant no longer suffers from a dangerous mental disorder and is not mentally ill (*see id.* § 330.20 [12]). The Commissioner must give 10 days' written notice of this application to the district attorney, the defendant, his counsel and the Mental Hygiene Legal Service.

Upon receipt of the application, the judge must promptly hold a hearing to determine the defendant's present mental condition. If the judge finds that the defendant suffers from a dangerous mental disorder, he must deny the application for a release order; if he finds that the defendant does not suffer from a dangerous mental disorder but is mentally ill, he must issue a transfer order, with an order of conditions, assuming the defendant is still confined in a secure facility.

But if the judge finds that the defendant does not suffer from a dangerous mental disorder and is not mentally ill, he must grant the Commissioner's application and issue a release order, with an order of conditions. Further,

> "[t]he order of conditions issued in conjunction with a release order shall incorporate a written service plan prepared by a psychiatrist familiar with the defendant's case history and approved by the court, and shall contain *any conditions that the court determines to be reasonably necessary or appropriate. It shall be the responsibility of the commissioner to determine that such defendant is receiving the services specified in the written service plan and is complying with any conditions specified in such plan and the order of conditions*" (*id.* [emphasis added]).

### Recommitment Orders

At any time while an order of conditions remains in effect, the Commissioner or a district attorney may apply to the court that issued the order, or a superior court in the county where the track-one defendant then resides, for a recommitment order when, in the applicant's view, the defendant again exhibits a dangerous mental disorder (*see id.* § 330.20 [14]; *see also id.* § 330.20 [1] [f]). The applicant must give written notice to the defendant, his counsel and the Mental Hygiene Legal Service, and, if the applicant is the Commissioner, to the district attorney or, if the applicant is the district attorney, to the Commissioner.

Upon receipt of the application, the judge must order the defendant to appear for a hearing to determine his mental status.

This order takes the form of a written notice of the time and place of appearance, served either personally or by mail. If the defendant fails to appear in court as directed, the judge may issue a warrant directing a peace officer to take him into custody and bring him before the court, and may direct that the defendant be confined in an appropriate nearby institution (*see id.* § 330.20 [14]).

At the hearing, the applicant must satisfy the judge that the defendant suffers from a dangerous mental disorder. If the applicant succeeds, the judge must issue a recommitment order, again consigning the defendant to a secure facility for care and treatment for six months. The periodic retention reviews then begin anew (*see id.*; *see also id.* § 330.20 [1] [f]).

## II.

### Robert T.

In July 1995, Robert T., who had a history of psychiatric problems dating back to 1969, in an apparent suicide attempt intentionally drove his car into oncoming traffic and killed another motorist. Robert T. was charged with second-degree manslaughter (Penal Law § 125.15 [1]), and was subsequently found not responsible for this crime by reason of mental disease or defect. The trial judge determined that Robert T. suffered from a dangerous mental disorder, and in March 1996 committed him to a secure OMH facility. In October 1997, Robert T. was transferred, subject to an order of conditions, to a nonsecure OMH facility.

In August 2002, Robert T. was released from confinement into the community, subject to a five-year order of conditions. The order was extended for three years in 2007. In connection with an application in 2010 to extend the order yet again, OMH submitted materials reflecting the hospital forensic committee's view that Robert T. exhibited an adversarial attitude toward the requirements of his order of conditions, was not always forthcoming in treatment and was unable to use coping skills to manage stressful situations. Robert T.'s treatment team concluded that he continued to display a number of the risk factors that led to his decision to drive recklessly in 1995, which made him "vulnerable to act violently"; further, that Robert T. had a history of reducing the medications necessary for management of his mental condition. The treatment team and the committee unanimously recommended an extension of Robert T.'s order of conditions.

In its proposed order, OMH asked the court to include the following related provisions:

"ORDERED that should the defendant fail to comply with any of the above conditions, or in the event the treatment team becomes aware of a change in his/her mental condition that indicates an emergence of risk factors, he/she shall submit to a psychiatric examination by the staff of the monitoring OMH facility as designated by that Clinical Director.

"ORDERED that should the defendant fail to comply with any of the above conditions and refuse to appear for or comply with a psychiatric examination, the Commissioner shall apply to the court for a Temporary Confinement Order for the purpose of conducting an effective psychiatric examination in a secure facility."

Robert T. objected to the second of the above-stated requirements—the effective-evaluation provision—on the ground that it conflicted with the recommitment procedures in Criminal Procedure Law § 330.20 (14). Supreme Court Justice Sproat rejected his complaint, and included the provision in an amended order of conditions issued on December 16, 2010.

## Allen B.

In 1993, Allen B., who had a long history of hospitalizations and arrests for violent acts, set fire to an occupied building. He had been drinking and was suffering heroin withdrawal at the time. Allen B. was charged with second-degree arson (Penal Law § 150.15) and first-degree reckless endangerment (id. § 120.25); he was subsequently found not responsible for these crimes by reason of mental disease or defect. The trial judge determined that Allen B. suffered from a dangerous mental disorder, and in January 1994 committed him to a secure OMH facility. In July 1995, Allen B. was transferred, subject to an order of conditions, to a nonsecure OMH facility.

In the fall of 2005, Allen B. was released from confinement into the community, subject to a five-year order of conditions. OMH sought to extend the order in 2010. At the time, Allen B. was living in housing operated by a not-for-profit human services agency, and was receiving outpatient services at an OMH psychiatric center, where he had an intensive case manager.

While crediting Allen B.'s progress and abstinence from drugs and alcohol, the hospital forensic committee noted his need for continued supervision to stay focused on his employment and mental health, and to function within his residential setting. The committee opined that Allen B. would pose a public safety risk if discharged from supervision.

OMH proposed an order with the effective-evaluation provision, and Allen B. protested that this requirement conflicted with the recommitment procedures in Criminal Procedure Law § 330.20 (14). Supreme Court Justice Sproat rejected his objection, and included the provision in an amended order of conditions issued on December 16, 2010.

### Article 78 Petitions

Robert T. and Allen B. (collectively, petitioners) filed CPLR article 78 petitions in the Appellate Division against Justice Sproat, the Commissioner and the District Attorneys of Delaware (Allen B.) and Ulster (Robert T.) Counties. Petitioners sought writs of prohibition barring enforcement of the effective-evaluation provisions on the ground of inconsistency with Criminal Procedure Law § 330.20 (14)'s specific procedure for recommitment orders.

Both matters were submitted to the same panel of the Appellate Division. On November 28, 2012, the court decided in favor of Robert T., with one Justice dissenting, and granted his petition (102 AD3d 176 [2d Dept 2012]); and, in *Allen B.*, the panel, split along the same lines, granted the petition for the reasons stated in *Robert T.* (100 AD3d 989 [2d Dept 2012]).

The majority in *Robert T.* held that the effective-evaluation provision, which they called "an ex parte enforcement procedure for addressing violations of the amended order of conditions," was barred by the recommitment provisions in Criminal Procedure Law § 330.20 (14), the exclusive remedy "if an individual violates an order of conditions and has a history of dangerous mental disorder" (*Robert T.*, 102 AD3d at 182, 183). The majority reasoned that, because recommitment requires notice and an opportunity to be heard, the effective-evaluation provision conflicted with Criminal Procedure Law § 330.20 (14), and that Criminal Procedure Law § 330.20 (1) (*o*) and (12), which authorize the supervising court to impose "any other condition . . . determine[d] to be reasonably necessary or appropriate" could not be "conflated so as to ignore [Criminal Procedure Law § 330.20 (14)'s] due process protections" (*Robert T.*, 102 AD3d at 183).

The dissenting Justice distinguished recommitment—the prescribed procedure when a track-one defendant has decompensated to the point of dangerousness—from the effective-evaluation provision, a "preventive and preemptive mechanism" (*id.* at 191 [Rivera, J., dissenting]). He pointed out that nothing in Criminal Procedure Law § 330.20 precluded Supreme Court from employing the effective-evaluation provision as a "tool for monitoring a potential onset of symptomatology, anticipatory to a likely regression or decompensation"; indeed, "the legislature . . . expressly permitted [the supervising court] to issue conditions which it determine[d] to be 'reasonably necessary or appropriate' " (*id.*).

Further, the dissenting Justice rejected Robert T.'s argument that the effective-evaluation provision violated his constitutional rights because

> "[t]he disputed provision simply permits the Commissioner to apply to the court for a temporary confinement order for the purpose of conducting a psychiatric examination. The court, which is ultimately responsible for maintaining ongoing judicial supervision over [Robert T.'s] treatment, must then determine whether it is appropriate to grant or deny the application" (*id.* at 192).

Finally, he disputed the majority's characterization of the effective-evaluation provision as "an ex parte enforcement procedure," noting that Robert T. was given "ample notice and warning of what is expected of him, and of the consequences that may result should he fail to comply with the listed conditions and refuse to submit to a psychiatric examination" (*id.*).

Justice Sproat and the Commissioner moved in the Appellate Division for leave to appeal in both *Robert T.* and *Allen B.* On April 3, 2013, the court granted both motions, certifying the following question in each case: "Was the opinion and judgment of [the Appellate Division] dated November 28, 2012, properly made?" (2013 NY Slip Op 69361[U] [2013]; 2013 NY Slip Op 69385[U] [2013].)

### III.

The extraordinary remedy of prohibition is available only where a judicial or quasi-judicial body acts or threatens to act "without or in excess of its jurisdiction and then only when the clear legal right to relief appears and, in the court's discretion, the remedy is warranted" (*Matter of Schumer v Holtzman*, 60

NY2d 46, 51 [1983] [citations omitted]). Here, petitioners can prevail only if Criminal Procedure Law § 330.20 prohibits their restraint for any reason other than failure to obey a court order to appear for a recommitment hearing.

Section 330.20 mandates an order of conditions whenever a track-one defendant moves from secure to nonsecure confinement, or is no longer institutionalized (CPL 330.20 [11], [12]), and allows the court to fashion these orders in whatever way, in its judgment, most effectively protects the public while serving the defendant's interest in remaining in the least restrictive environment possible. "[T]he order of conditions is the vehicle by which the . . . court effectuates its continuing supervisory authority over" a defendant found not responsible for a crime by reason of mental disease or defect (*Matter of Jill ZZ.*, 83 NY2d 133, 138 [1994]). And while the Commissioner and the district attorney may appeal from an order of conditions, the defendant may not (*see* CPL 330.20 [21]). This insulates the supervising court from a defendant's attempt to argue that a condition, thought by the judge to be a necessary prophylactic measure, excessively restricts his freedom.

■ Accordingly, section 330.20 authorizes orders that, along with a prescribed treatment plan, include *"any other condition which the court determines to be reasonably necessary or appropriate"* (CPL 330.20 [1] [o] [emphases added]). Notably, the statute repeats this broad language when describing the order of conditions that must accompany a release order, and further requires the Commissioner to *"determine that"* the defendant is *"complying with* any conditions specified in [the written service plan] *and the order of conditions"* (CPL 330.20 [12] [emphases added]).

The effective-evaluation provision enables OMH to evaluate a track-one defendant who does not comply with court-ordered conditions and refuses to be examined voluntarily. Track-one defendants are released into the community with the express understanding that they may endanger the public and themselves if their mental health declines. Indeed, reported cases illustrate the perils posed when such defendants do not follow the regime designed by mental-health professionals and imposed by courts to safeguard their stability and functioning in the community (*see e.g. Matter of Francis S.*, 206 AD2d 4, 8-11 [1st Dept 1994], *affd* 87 NY2d 554 [1995]; *Stone*, 73 NY2d at 298-299; *Matter of George L.*, 85 NY2d 295, 299 [1995]). The dangers of noncompliance are exacerbated when a track-one defendant

also refuses to submit to a psychiatric evaluation thereby denying vital information to the Commissioner, whom section 330.20 (12) makes responsible for ensuring compliance with orders of conditions issued with release orders.

Contrary to petitioners' argument, Criminal Procedure Law § 330.20 nowhere suggests that the legislature intended the recommitment procedure to displace a court's ability to fashion more limited remedies to detect or redress the deterioration of a track-one defendant's mental health. As already discussed, the legislature expressly vested courts with authority to impose "any other condition" determined "to be reasonably necessary or appropriate" (CPL 330.20 [1] [o]). Under petitioners' narrow interpretation of this language, OMH would be forced either to wait until the defendant exhibited overt signs of dangerousness and then pursue recommitment, or seek the return of every at-risk defendant to a secure facility for at least six months, even though less intrusive measures might suffice. The first option jeopardizes the public; both options compromise the defendant's welfare and cut against the grain of common sense.[2]

Petitioners' view of the statutory scheme also conflicts with our oft-espoused view that "the provisions of CPL 330.20 for imposing orders of conditions" are the means by "which the

---

2. The dissent suggests that OMH might, alternatively, resort to "the more broadly applicable civil emergency commitment provisions of Mental Hygiene Law article 9" (*see* dissenting op at 382). Petitioners agree. But this assumes that a track-one defendant is subject to article 9 while still under court supervision pursuant to section 330.20—i.e., before the supervising court issues a discharge order (*see* CPL 330.20 [1] [n]; [13]). As the dissent itself acknowledges, section 330.20 "comprehensively governs the disposition" of these particular defendants (dissenting op at 380). In any event (and perhaps for this reason), the Mental Hygiene Law does not account for the unique risks posed by track-one defendants who have, by definition, committed a crime and once been adjudged to suffer from a dangerous mental disorder. And, comparable to recommitment under Criminal Procedure Law § 330.20 (14), civil commitment under article 9 is available only for those individuals whose mental illness has already degenerated sufficiently to be "likely to result in serious harm to themselves or others" (*Matter of K.L.*, 1 NY3d 362, 368 n 1 [2004]). In short, article 9 does not permit the prophylactic intervention contemplated by an effective-evaluation provision.

Additionally, article 9 proceedings utilize standards appropriate for those with no prior history of mental illness or criminal violence, and therefore may not give proper weight to factors important for assessing the mental health of a track-one defendant. For example, substance abuse alone may not be enough to support commitment under article 9. But if a track-one defendant is directed to refrain from abusing drugs, a violation of that condition should be sufficient to justify a psychiatric evaluation. Here, for example, substance abuse strongly correlates with Allen B.'s past violent behaviors.

criminal court retains supervisory authority over insanity acquittees" (*Matter of Francis S.*, 87 NY2d 554, 562 [1995]). If a supervising court has no power to ensure that a defendant follows the order of conditions, it is hard to see how the court then carries out "continuous supervision over the acquittee . . . through an order of conditions" (*id.* at 563). Instead, the court would effectively be required to "abandon[ ] . . . all supervision of the acquittee [who does not abide by an order of conditions and] whose potential violent conduct is controllable only when medicated" until he has decompensated to the point of dangerous mental disorder—a result that the legislature "could not rationally have intended" given that it would "subject the public to [an] enormous risk" (*Matter of Oswald N.*, 87 NY2d 98, 104 [1995] [internal quotation marks omitted]).

We have interpreted other provisions in Criminal Procedure Law § 330.20 broadly, consistent with the legislative purpose. For example, we held in *Oswald N.* that a supervising court may properly impose conditions on a track-one defendant's release for more than 10 years even though the statute does not expressly authorize such an extension. Instead, the statute in question—Criminal Procedure Law § 330.20 (1) (*o*)—states that an order of conditions "shall be valid for five years from the date of its issuance, except that, for good cause shown, the court may extend the period for an additional five years." We observed that "nothing in the language of CPL 330.20 . . . affirmatively limits courts to only two consecutive five-year orders of conditions" (87 NY2d at 103). We have also determined that the requirement that the State prove "current dangerousness" does not "constrain a court to determining dangerousness as of the moment in time that a defendant is before it" (*George L.*, 85 NY2d at 305).

As for petitioners' due process objections, the language of the effective-evaluation provision does not in any way suggest that a court would issue an examination order ex parte or without notice or a hearing. This provision simply allows OMH to make an application to the supervising judge, who retains discretion to require whatever procedures he deems necessary to protect a track-one defendant's rights and properly decide the application. Moreover, the effective-evaluation provision is limited and targeted; it contemplates a temporary removal to an OMH facility for only so much time as it takes to conduct an effective psychiatric examination, and only after the court finds that the track-one defendant has both neglected to comply with court-ordered conditions and refused to be evaluated.

In *Matter of K.L.*, we determined that the involuntary detention of a psychiatric patient for up to 72 hours, while a substantial deprivation of liberty, comported with due process. Part of our reasoning there was that "the state's interest in immediately removing from the streets noncompliant patients previously found to be, as a result of their noncompliance, at risk of a relapse or deterioration likely to result in serious harm to themselves or others is quite strong" (1 NY3d at 373). This interest is even stronger in the case of track-one defendants like petitioners, who have committed violent crimes and remain at risk of doing so again if their mental health worsens.

Finally, we have examined petitioners' other claims and consider them to be without merit.

Accordingly, in both cases the judgment of the Appellate Division should be reversed, without costs, the petition dismissed, and the certified question not answered as unnecessary.

Chief Judge LIPPMAN (dissenting). The question for our decision is not one of policy. It is whether there is law to authorize the State's presently proposed initiative to securely confine conditionally released insanity acquittees outside the substantive and procedural due process framework set forth in CPL 330.20 (14).[1]

---

1.  The statute provides in relevant part:
    "Recommitment order. At any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court that issued such order, or to a superior court in the county where the defendant is then residing, for a recommitment order *when the applicant is of the view that the defendant has a dangerous mental disorder. The applicant must give written notice of the application to the defendant, counsel for the defendant, and the mental hygiene legal service, and if the applicant is the commissioner he must give such notice to the district attorney or if the applicant is the district attorney he must give such notice to the commissioner. Upon receipt of such application the court must order the defendant to appear before it for a hearing to determine if the defendant has a dangerous mental disorder. Such order may be in the form of a written notice, specifying the time and place of appearance, served personally upon the defendant, or mailed to his last known address, as the court may direct. If the defendant fails to appear in court as directed, the court may issue a warrant to an appropriate peace officer directing him to take the defendant into custody and bring him before the court. In such circumstance, the court may direct that the defendant be confined in an appropriate institution located near the place where the court sits. The court must conduct a hearing to determine whether the defendant has a dangerous*

It is not disputed that CPL 330.20—the provisions of which are recounted at length in the majority opinion—comprehensively governs the disposition of insanity acquittees. The determinative issue, then, is whether that statute contains any provision permitting what the State proposes, namely, the summary removal of a released insanity acquittee to a secure psychiatric facility based simply on ex parte allegations of noncompliance with treatment or monitoring requirements imposed at the time of the acquittee's release. The statute contains nothing answering to this description. It is, to the contrary, unequivocal, not only as to the singular substantive standard for recommitting insanity acquittees—namely, affliction with a dangerous mental disorder—but as to the process that must be afforded when secure recommitment is sought. The State's application must be made on notice to the defendant and his counsel; there must be a hearing on the application, at which the burden is upon the State to prove the substantive ground for recommitment; and, in the event an application is granted, there are statutorily prescribed commitment periods at the conclusion of which the propriety of any proposed retention of the defendant is subject to judicial review.

The State's contention, now made law by a vote of judges, that an insanity acquittee may be securely psychiatrically committed on the basis of mere allegations of noncompliance with mandated treatment or monitoring, significantly undermines the substantive due process and procedural protections of CPL 330.20 (14); the new expedited species of removal is, in contrast to the legislature's recommitment provision, essentially standardless and without process to guard against an erroneous deprivation of liberty. Indeed, the State makes no provision in

*mental disorder. At such hearing, the applicant, whether he be the commissioner or the district attorney must establish to the satisfaction of the court that the defendant has a dangerous mental disorder. If the applicant is the commissioner, the district attorney shall be entitled to appear and present evidence at such hearing; if the applicant is the district attorney, the commissioner shall be entitled to appear and present evidence at such hearing. If the court finds that the defendant has a dangerous mental disorder, it must issue a recommitment order. When a defendant is in the custody of the commissioner pursuant to a recommitment order, the procedures set forth in subdivisions eight and nine of this section for the issuance of retention orders shall govern the application for and the issuance of a first retention order, a second retention order, and subsequent retention orders"* (emphasis supplied).

its "effective examination" order even for post hoc judicial review of the summary commitment it allows. While the State urges that its objective is modest—simply to allow for the "effective examination" of the defendant—it is remarkably vague about what that will entail, either temporally or psychiatrically, and it is, in any event, axiomatic that "commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protection" (*Addington v Texas*, 441 US 418, 425 [1979] [emphasis supplied]). Here there is none.

The approach now taken is not consonant with CPL 330.20's vaunted objective of "safeguarding the rights of defendants found not responsible" (*People v Stone*, 73 NY2d 296, 303 [1989]). It is manifest that when the legislature afforded judges power to prescribe "reasonably necessary or appropriate" conditions of release (CPL 330.20 [1] [*o*]) it did not allow what the orders before us permit. The Court's holding to the contrary slights and significantly undoes the legislature's careful work in crafting CPL 330.20 (14) to comport with the demands of due process. Moreover, even if there were no constitutional impediment to the taking of liberty in the manner contemplated by these orders, characterizing a provision authorizing summary secure confinement as a "condition" of release prescribable pursuant to section 330.20 (1) (*o*) presents a significant semantic challenge, which the majority, referring to the provision as a "requirement," glosses over and the State purports to meet by claiming that the provision "resembles" other provisions qualifying as conditions. The reality is that the provision at issue does not set forth conditions of release, but grounds for secure confinement and that those grounds have no statutory provenance.

The State points out, correctly, that New York does have a statute that allows psychiatric confinement for evaluative purposes on the basis of ex parte orders (*see e.g.* Mental Hygiene Law § 9.60 [n] [Kendra's Law]). But the presently salient point is that when the legislature has made this extraordinary removal mechanism available it has done so expressly, carefully defining both the class of persons to whom it may be applied and the circumstances immediately justifying its use. This has not been done in CPL article 330, probably because the power to recommit pursuant to CPL 330.20 (14) has been considered adequate to deter and, if necessary, respond to violations of conditions governing an insanity acquittee's release. We have noted that

"[t]he legislative objectives of ensuring the safety of the public, safeguarding the rights of defendants found not responsible, and providing for the treatment of acquittees suffering from a current mental illness are secured by recommitment provisions [of CPL 330.20 (14)] designed to ensure that all persons who develop or relapse into a dangerous mental disorder during the pendency of the order of conditions are amenable to a secure psychiatric placement" (*Stone*, 73 NY2d at 303).

It is not possible to discern a basis for the Court's present implicit reevaluation of this assessment, particularly since the potent enforcement mechanism of CPL 330.20 (14) is supplemented where released insanity acquittees are concerned by the more broadly applicable civil emergency commitment provisions of Mental Hygiene Law article 9 (*see* Mental Hygiene Law §§ 9.37, 9.39, 9.40, 9.43).[2]

Petitioners could, of course, be summarily committed for psychiatric examination if they met the criteria of Mental Hygiene Law § 9.60 (c) for assisted out-patient treatment and they failed to comply with their prescribed treatment regimen (*see* Mental Hygiene Law § 9.60 [n]). It would appear, however, that they are not candidates for assisted out-patient treatment, since, to mention but one disqualifying factor, they have, as CPL 330.20 releasees, been found not to be mentally ill (*see* CPL 330.20 [12]).[3] The legislature went to some trouble closely to define the class for whom summary commitment might be appropriate (*see* Mental Hygiene Law § 9.60 [c]), a circumstance we deemed pivotal in upholding Mental Hygiene Law § 9.60 (n) as against constitutional challenge (*Matter of K.L.*, 1 NY3d at 373). It is

---

**2.** Even if it were true that, as the majority suggests (majority op at 377 n 2), a track one CPL 330.20 releasee could not be hospitalized in an emergency pursuant to article 9 of the Mental Hygiene Law—a proposition that is doubtful both legally and prudentially—it would not advance the majority's argument as to what CPL 330.20 itself permits. Neither that statute, nor for that matter any other, permits involuntary psychiatric hospitalization without a substantive standard and without process.

The majority's assertion that article 9's involuntary hospitalization standards are inappropriate for those with a prior history of mental illness or criminal violence (majority op at 377 n 2) is without empirical basis. Article 9 involuntary admittees very frequently suffer from chronic mental illness and many have histories, if not of crime, of conduct that could have been treated as criminal.

**3.** Prominent among the extensive criteria for assisted out-patient treatment (*see Matter of K.L.*, 1 NY3d 362, 367 [2004]) is the requirement that the patient suffers from mental illness.

not plausible that the legislature casually—practically tacitly—has sanctioned similarly precipitous intervention respecting persons not within that or any other relevantly defined class.

It is easy to suppose that insanity acquittees present elevated risks. When, however, they have been released pursuant to an order of conditions it is usually after years of extraordinarily closely monitored institutional care[4] and upon judicial findings that they are no longer mentally ill and do not suffer from a dangerous mental disorder (CPL 330.20 [12]). If "effective examination" in a secure inpatient psychiatric facility is to be used as to this class of individuals as a summary enforcement device, it must, I believe, be pursuant to authority expressly conferred by the legislature. Judges have no power unilaterally to provide for such an extraordinary intervention, particularly in the context of a statute expressly conditioning secure psychiatric re-institutionalization upon the prior satisfaction by the State of rigorous constitutionally-rooted substantive and procedural requirements.

Accordingly, I dissent and would affirm the well-considered decision and judgments of the Appellate Division.

Judges GRAFFEO, SMITH and ABDUS-SALAAM concur with Judge READ; Chief Judge LIPPMAN dissents in an opinion in which Judges PIGOTT and RIVERA concur.

In each case: Judgment reversed, without costs, petition dismissed, and certified question not answered as unnecessary.

---

**4.** Petitioners present no exception. Each was institutionalized for years (Robert T., for more than 6 years, and Allen B., for nearly 12) until, after extensive clinical evaluation and the phased lessening of restrictions pursuant to court orders, each was ordered released pursuant to an order of conditions.