People v Darryl T. (2018 NY Slip Op 02280)





People v Darryl T.


2018 NY Slip Op 02280


Decided on March 29, 2018


Appellate Division, First Department


Tom, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 29, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Peter Tom, J.P.
Barbara R. Kapnick
Jeffrey K. Oing
Anil C. Singh, JJ.


1311/13 5404 

[*1]The People of the State of New York, Respondent,
v
Darryl T. (Anonymous), Defendent-Appellant,



Defendant appeals from the order of the Supreme Court, Bronx County (Ralph Fabrizio, J.), entered on or about May 31, 2016, insofar as it denied defendant a new initial hearing pursuant to CPL 330.20 in connection with his plea of not responsible by reason of mental disease or defect.




Michael D. Neville, Mental Hygiene Legal Service, Mineola (Ana Vuk-Pavlovic and Dennis B. Feld of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Shannon Henderson and Justin J. Braun of counsel), for respondent.



TOM, J.P.


In this appeal, we must consider whether defendant was deprived of the effective assistance of counsel when, following his plea of not responsible by reason of mental disease or defect to robbery in the first degree, his counsel conceded that defendant had a dangerous mental disorder, and effectively waived defendant's right to an initial hearing concerning his civil confinement pursuant to Criminal Procedure Law 330.20(6).
Defendant Daryl T., now nearly 50 years old, has a history of mental illness that began at age 10 and a history of committing larceny during psychiatric episodes that occurred when his medication had worn off. He has been diagnosed repeatedly with bipolar disorder and schizoaffective disorder, a combination of schizophrenia and mood disorders, and has been hospitalized repeatedly as a danger to himself and others, due to his auditory hallucinations and voices telling him to kill himself and others. He has also been treated with several different antipsychotics and mood stabilizers.
When defendant was between 14 and 16 years old, he stabbed a man with intent to kill, [*2]and then stabbed himself. In 1994, he tried to hurt himself by taking his friend's gun and was confined at the Creedmoor Psychiatric Center for observation from October 1994 to March 1995; he told medical personnel that he had heard voices in his head since age six, that the voices told him to kill, and that he had previously stabbed himself because of those voices.
Defendant was confined in institutions for periods of a few days to a week at a time in March 2003, January 2005, January 2006, May-June 2010, October 2010, May 2011, June 2011, July-August 2011, and January 2012. During those confinements, he said that he heard voices and that he wanted to kill himself and others, and throughout his medical history, he has tested positive for alcohol and cocaine on numerous occasions.
In August 2012, defendant tried to jump off the George Washington Bridge. Some days before that, five security officers had escorted him out of Mount Sinai Hospital after he threw monitor cords at the staff and threatened to hurt staff outside of the hospital. On March 19, 2013, while hospitalized at Bellevue, defendant said he heard voices in his head that told him he was worthless and should kill himself. One week after his release from Bellevue, he committed the offense to which he pleaded not guilty by reason of mental disease or defect.
It was alleged that in the late evening of March 27, 2013, defendant was seen shoplifting items from a Pathmark grocery store, and that when Pathmark employees confronted him, he took out a knife and said, in sum and substance, "I'm going to shoot you." Defendant was arrested and charged with robbery in the first degree, robbery in the third degree, petit larceny, criminal possession of stolen property in the fifth degree, and criminal possession of a weapon in the fourth degree.
From March 31, 2014 to April 15, 2014, he was confined, and treated for hearing voices telling him to kill himself and others, and between April 17, 2014 and April 25, 2014, he was again diagnosed with schizoaffective disorder and a history of alcohol and cocaine abuse.
On February 27, 2015, while represented by an attorney from the 18-B panel, defendant pleaded not responsible by reason of mental disease or defect to robbery in the first degree. The People acknowledged that they had received the psychiatric evidence in the case, including defendant's medical records from October 12, 1994 to April 15, 2014, and more than 3,400 pages pertaining to defendant's placement in eight institutions, not including the approximately 10 times that he was seen by the New York City Correctional Health Services in Rikers Island. Those records were admitted into evidence.
Defense counsel confirmed that defendant understood the proceedings, that he had discussed the case with defendant, that defendant understood the consequences of his plea, and that there were no other viable defenses to the charges.
The court asked defendant whether he was aware that the charge to which he was pleading not responsible by reason of mental disease or defect was robbery in the first degree, and defendant said yes. The court asked, "Do you understand the consequences of such plea?," and defendant said he did. Defendant also confirmed that he understood that he had a right to plead not guilty, a right to a trial at which the People would have to call witnesses, the right to cross-examine those witnesses, and the right not to incriminate himself. He also said that he understood that by entering his plea of not responsible there would not be a trial, and that he was waiving his right to a trial. He further acknowledged the truth of the People's allegations, as previously described, regarding his conduct on March 27, 2013, at Pathmark. At the court's request, the prosecutor summarized the psychiatric evidence and history set forth above.
Based on the history and psychiatric evidence, the prosecutor said that defense counsel had conceded that defendant was a danger to himself and society. Defense counsel agreed that he conceded that defendant was a danger to himself and society. He noted that defendant's conduct arose when he was not on his medication, and that when he took his medication, he was "highly functional, ... intelligent, [and] cooperative." Nevertheless, defense counsel confirmed that he [*3]was not disputing the medical testimony or the statements made by the prosecutor about defendant's psychiatric history.
Defense counsel also said that defendant had the capacity to understand the plea proceeding, but did not have the capacity to understand what he was doing at the time of the robbery.
The court, referring to a CPL 330.20(6) initial hearing, confirmed that both parties were "not requesting that any hearing be held, because the hearing would not establish anything further than what has been presented here today." Both the prosecutor and defense counsel agreed.
The court asked defendant whether he understood "what's going on," and defendant said he did, and confirmed that he had taken his prescribed medications on that day. Defendant also confirmed that he had not taken his medication on March 27, 2013, the day of the robbery.
Defendant further confirmed that no one had threatened him or forced him to plead not responsible. Defense counsel said that he had numerous conversations with defendant about the plea and that he was satisfied that defendant had the capacity to understand the consequences of a plea of not responsible.
The court then concluded that it was satisfied that each element of robbery in the first degree as alleged in the indictment would be proved beyond a reasonable doubt at trial, that the defense would prove by a preponderance of the evidence the affirmative defense of lack of criminal responsibility by reason of mental disease or defect, that defendant had the capacity to understand the proceedings and assist in his defense, and that defendant's plea was knowing and voluntary.
Pursuant to CPL 330.20, the court issued a written examination order requiring a psychiatric examination to determine whether defendant had a dangerous mental disorder or was mentally ill. The court adjourned to await completion of the examination and report on defendant's mental condition.
Defendant was admitted to the Mid-Hudson Forensic Psychiatric Center (Mid-Hudson) for the examinations. Dr. Mark Bernstein and Dr. Nancy Flores-Migenes examined defendant and issued reports that concluded that defendant had a dangerous mental disorder and was a danger to himself and others and that he needed inpatient care with the highest available level of security.
Dr. Bernstein opined that defendant suffered from "chronic Schizoaffective thought disorder ... complicated by alcohol, cocaine and cannabis abuse with an underlying Antisocial Personality." He found that defendant had previously threatened staff at hospitals, and had a history of poor compliance with treatment recommendations.
Dr. Flores-Migenes similarly diagnosed defendant with "Schizophrenia, Chronic, Paranoid-Type," with a history of alcohol and cocaine abuse, which led to conduct dangerous to himself and others. Dr. Flores-Migenes noted that defendant had told her that all of the information he had given to other facilities were "lies," and that he had been taking his medication at the time of his arrest. He alternated between acknowledging that he was noncompliant and saying that he was always compliant with his medication requirements.
In various letters to the court, defendant asked to withdraw his plea, saying that defense counsel had misinformed him and told him not to ask questions during the plea proceeding, that he had been hearing voices before the proceeding, and that he had lied in the past about having suicidal thoughts. He also said that defense counsel had told him that he would prefer a 1 to 30-day commitment in a civil hospital to the program the court had previously offered. Defendant claimed both that he had been on cocaine on the night of the offense and that he had been on his medications.
At a proceeding on May 28, 2015, defendant addressed the court directly in an effort to take back his plea; he told the court that defense counsel had told him on February 20, 2015 that [*4]he had gotten him a deal of 1 to 30 days in a civil hospital, and that counsel had told him "to come into the courtroom and say [] yes to everything.... [T]hey confirmed that I was on medicine during the time of the crime. He [defense counsel] told me to say that I wasn't." Defendant thus asked to "withdraw this plea." He added, "I know I don't belong in a one day to life plea for this charge." Defendant denied being dangerously mentally ill. He explained that he had a "bad cocaine history" in 1989 or 1998, and that he had cut or stabbed himself, and that when he wanted to detox he would lie and say he wanted to kill himself, and he would be admitted immediately to the psych ward, where he would detox and get clean.
The court said, "I would not have thought that they would have made a determination that you were suffering from an affliction and also that you constitute a danger to yourself and to others. However, obviously I'm not an expert in . . . psychiatric evaluations." The court noted that two experts had determined that defendant was a danger to himself. The court also explained that the determinations were not based solely on defendant's statements, but also on his medical records, prior diagnoses, and approximately 20 earlier hospitalizations. Defendant said that he hospitalized himself, that a dangerously mentally ill person would not do that, and that the finding that he suffered from a dangerous mental disorder was a lie. The court replied that it was bound by the findings in the reports.
The People argued that defendant should be committed because he had been found to be a danger to himself or society. Defense counsel said that he relied on the psychiatrist's reports and plea allocution and otherwise deferred to the court's discretion.
The court denied defendant's oral request to withdraw his plea. Defendant protested: "If I had known this was a 330.20, I wouldn't have accepted this plea. That is why [defense counsel] didn't tell me that that's what it was. He told me one to 30 days in civil hospital." The court responded, "I told you it was 330.20." Defendant said that he "didn't know anything about a 330.20" and that defense counsel had told him to say yes to everything. The court said, "I explained to you exactly what was going on. You took the plea." Defendant said, "If I had understood, I wouldn't have taken it." The court repeated that it had explained it to defendant and added that if defendant was released, then he could avail himself of the program.
The court issued an order of commitment upon its finding that defendant was not responsible by reason of mental disease or defect, and defendant was committed to Mid-Hudson. On October 6, 2015, defendant was transferred to the Rochester Psychiatric Center, where he is currently hospitalized.
In March 2016, defendant moved, through Mental Hygiene Legal Services, to withdraw or vacate his plea or, in the alternative, for a new initial hearing pursuant to CPL 330.20(6). Defendant argued that Supreme Court did not sufficiently advise him of, and ensure he understood, the consequences of his plea, specifically, that his plea could result in his commitment in a secure psychiatric facility, potentially for life. He also contended that he received ineffective assistance of counsel when his attorney conceded that he had a dangerous mental disorder and effectively waived his right to a hearing on his mental status. In the alternative, defendant argued that he was deprived of a proper initial hearing in light of counsel's concession, and sought a new initial hearing.
The People opposed the motion, arguing that the record established that defendant's plea was knowing, intelligent and voluntary, and that he received the effective assistance of counsel. In an affirmation, defendant's plea counsel maintained that he had explained defendant's sentence exposure, his option of completing a program, and his option of a not responsible plea, which could result in "his initial commitment to a secure facility to be followed by all necessary treatment in a secure facility." Counsel also said that "[a]fter review[ing] . . . all the facts in this matter" he believed that defendant was a danger to himself and others and in need of commitment, and thus he "deferred to the appropriate psychiatric experts."
Supreme Court denied defendant's motion, reasoning that the earlier denial of the oral application to withdraw the plea on the same grounds was the law of the case. The court separately concluded that the motion should be denied because the record established that defendant was advised about the consequences of a not responsible plea, and that the plea was made knowingly and voluntarily.
The court also denied defendant's request for a new initial hearing pursuant to CPL 330.20(6) because defendant had had an opportunity to be heard via his letters to the court. Thus, the court found that defendant had been afforded an opportunity to challenge the findings of the psychiatrists, and had been afforded due process. The court further found that counsel had not been ineffective for conceding the accuracy of those findings or waiving defendant's right to an initial hearing, as he could not raise meritorious challenges to the extensive psychiatric records. In this regard, the court said that attorneys were not required to challenge unanimous documented psychiatric findings that a defendant was a danger to him or herself or others, especially where arguments would be futile, citing Matter of Brian HH. (39 AD3d 1007, 1009 [3d Dept 2007]).
On October 19, 2016, a Justice of this Court granted defendant leave to appeal pursuant to CPL 330.20(21)(a)(ii), to the extent the May 31, 2016 order "denied the alternate relief requested in [defendant's] motion to withdraw or vacate his plea ..., namely, a new initial hearing under CPL 330.30." We now reverse and remand for an initial hearing.
As occurred here, after a court accepts a not responsible plea, it must issue an examination order for the defendant to be examined by two qualified psychiatric examiners (CPL 330.20[2]), who must submit to the court a report of their findings and evaluation regarding defendant's mental condition (CPL 330.20[5]).
Critical to this procedure is the requirement that the court conduct an initial hearing within 10 days after receipt of the psychiatric examination reports, in order to classify the defendant as "track one," "track two," or "track three" based on the defendant's mental condition (CPL 330.20[6]; Matter of Allen B. v Sproat, 23 NY3d 364, 368 [2014]).
The track is significant because it determines the level of the defendant's confinement and treatment. Track one is based on a finding of "dangerous mental disorder," meaning that the defendant suffers from a "mental illness," and that "because of such condition he currently constitutes a physical danger to himself or others" (CPL 330.20[1][c]; see Mental Hygiene Law § 1.03[20] [defining "mental illness"]). Track two is based on a finding of "mentally ill," without a dangerous mental disorder (CPL 330.20[1][d]). Track three is based on a finding of not mentally ill (CPL 330.20[7]).
"The track designation places more dangerous acquittees under the purview of the Criminal Procedure Law, while less dangerous, though still mentally ill, acquittees are committed to the custody of the Commissioner of Mental Health and come under the supervision of the Mental Hygiene Law" (Matter of Norman D., 3 NY3d 150, 154 [2004]). Thus, track designation is "vitally important in determining the level of judicial and prosecutorial involvement in future decisions about an acquittee's confinement, transfer and release" (id.).
Upon making a track one determination, the court will issue a commitment order committing the defendant to the custody of the commissioner for confinement in a secure facility for treatment for six months (CPL 330.20[1][f], [6]). Track one defendants can be detained for longer than the initial six-month confinement if a court issues subsequent retention orders, lasting up to two years at a time, upon finding that the defendant's dangerous mental disorder persists (CPL 330.20[1][g], [h]). Such orders could, in theory, be issued repeatedly for two years at a time, resulting in defendant's indefinite confinement (CPL 330.20[8]-[12]; see Allen B., 23 NY3d at 369-70). Track two defendants, on the other hand, are ordered into the Commissioner's custody for detention in a nonsecure (civil) facility, subject to an order of conditions, while track [*5]three defendants are discharged either unconditionally or, in the court's discretion, with an order of conditions (CPL 330.20[7]). Thus, "track one status is significantly more restrictive than track two status" (Norman D., 3 NY3d at 155).
At the initial hearing, the People bear the burden of proving "to the satisfaction of the court," i.e., by a fair preponderance of the credible evidence, that the defendant has a dangerous mental disorder or is mentally ill (CPL 330.20[6]; People v Escobar, 61 NY2d 431, 439-440 [1984]).
The initial hearing under CPL 330.20(6) is "a critical stage" of proceedings at which the defendant is entitled to the effective assistance of counsel (Brian HH., 39 AD3d at 1009). To prove a claim of ineffective assistance of counsel under New York law, a defendant must prove that defense counsel's performance, viewed in totality, did not amount to meaningful representation (People v Benevento, 91 NY2d 708, 711-712 [1998]; see also People v Turner, 5 NY3d 476 [2005]). We agree with defendant that counsel's performance did not meet that standard.
As defendant argues, at the same proceeding at which he entered his not responsible plea, his counsel simply conceded that he had a dangerous mental disorder, and thus implicitly consented to his confinement in a secure facility. Counsel also confirmed that he was not requesting that any hearing be held. These concessions waived defendant's right to an initial hearing. There could be no legitimate strategy that warranted these actions, and failing to challenge the worst possible outcome of a track one designation under the circumstances of this case did not amount to meaningful representation.
Notably, counsel rendered ineffective assistance when he conceded at the plea proceeding that defendant was a danger to himself and society, and waived defendant's right to an initial hearing before reviewing the psychiatric examination reports which had not yet been prepared for the court. Further, at the proceeding that followed the issuance of the reports, counsel simply relied on the psychiatrists' reports and deferred to the court's discretion. He did not call any witnesses or seek to cross-examine the psychiatrists who prepared the reports. Nor did counsel consult an expert on defendant's behalf who might have offered a contrasting opinion.
In Brian HH. (39 AD3d 1007), the court found that counsel had not provided meaningful representation when he failed to challenge the prosecutor's position that the evidence supporting the less restrictive track two status was not as credible as that supporting track one status. Counsel did not call witnesses, including a psychiatrist who had concluded that the respondent was mentally ill but not dangerous, and waived cross-examination of the psychiatrists supporting track one status. The court noted that there could be no valid strategy or legitimate explanation for counsel's conduct given that there were conflicting reports as to the respondent's condition (39 AD3d at 1009-1010). Similarly, in this case there could be no strategy or other proper explanation for waiving defendant's right to a hearing before any reports were issued to the court. In other words, counsel waived a hearing before even learning what the reports would conclude and whether they would offer conflicting opinions. Counsel's own review of the extensive medical records entered into evidence was not a sufficient substitute for reports prepared by psychiatrists for the CPL 330.20 proceeding.
Preserving defendant's right to an initial hearing was also critical in light of defendant's claims that he had lied about his mental condition and the court's acknowledgment that in its lay opinion defendant did not appear to be dangerous. In these circumstances, defense counsel should have consulted an independent psychologist or at least cross-examined the psychiatrists regarding, in particular, defendant's claims told to Dr. Flores-Migenes, that he had previously lied about his mental health, to obtain admission to facilities that would treat his drug use. While defendant's medical records may appear to show that he is dangerous, it is not a legitimate strategy to concede his track one status without further investigation or inquiry, under the [*6]circumstances of this case and since defendant's confinement in a secured psychiatric institution could be indefinite.
Furthermore, in contrast to this case, in People v Odell B.-P. (154 AD3d 534 [1st Dept 2017], lv denied __NY3d__, 2018 NY Slip Op 63820 [2018]) we found that the defendant received effective assistance of counsel at the initial hearing when his counsel explained to the court that she would not challenge the psychiatrists' findings that the defendant was dangerously mentally ill because the defense psychologist who examined the defendant had told her that he would not contest the findings. Of course, when counsel consults a defense expert who has personally examined the defendant, and is advised that there is no basis for challenging a finding that the defendant is dangerously mentally ill, it is reasonable for counsel not to challenge the finding. However, no such consultation or reasonable strategy took place here. Rather, counsel conceded defendant's status before any reports were issued and before any hearing was held.
Defendant's remaining claims, including whether the court abused its discretion in denying his motion to withdraw the plea, are beyond the scope of this Court's review pursuant to the grant of leave to appeal and therefore are not properly before us for consideration. In the alternative, to the extent these remaining claims are not rendered academic by our holding, we reject them on the merits. In any event, we find that defendant is entitled to a new initial hearing at which the People must prove, by a preponderance of the evidence, that he suffers from a dangerous mental disorder or is mentally ill (CPL 330.20[6]; People v Escobar, 61 NY2d at 440).
Accordingly, the order of the Supreme Court, Bronx County (Ralph Fabrizio, J.), entered on or about May 31, 2016, insofar as it denied defendant a new initial hearing pursuant to CPL
330.20 in connection with his plea of not responsible by reason of mental disease or defect, should be reversed, on the law, and the matter remanded for a new initial hearing.
All concur.
Order, Supreme Court, Bronx County (Ralph Fabrizio, J.), entered on or about May 31, 2016, reversed, on the law, and the matter remanded for a new initial hearing.
Opinion by Tom, J.P. All concur.
Tom, J.P., Kapnick, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 29, 2018
DEPUTY CLERK